IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

ELISA HOLLAND, o/b/o IMH

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

    Defendant.

Case No. CV 10-560-SI

**OPINION AND ORDER**

David B. Lowry
9900 S.W. Greenburg Road, Suite 130
Portland, Oregon 97223
    Attorney for Plaintiff

Dwight C. Holton
United States Attorney
District of Oregon
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

Benjamin J. Groebner
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
    Attorneys for Defendant

///

**SIMON, District Judge:**

## I. INTRODUCTION

This is an action to obtain judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying the application of Elisa Holland, on behalf of her minor son IMH, for Supplemental Security Income ("SSI") benefits. Ms. Holland alleges that IMH is disabled by Attention Deficit Hyperactivity Disorder ("ADHD"), depression, emotional disorders, and Bipolar Disorder. The Commissioner found IMH not disabled. Ms. Holland asserts that the Commissioner erred by failing to accept or reject witness testimony and by failing to consider evidence contrary to his findings that IMH had less than marked limitations in the domains of attending and completing tasks, acquiring and using information, and caring for himself. For the reasons that follow, this case is reversed and remanded for additional administrative proceedings consistent with this decision.

## II. BACKGROUND

Ms. Holland filed an application for benefits on July 26, 2006, alleging an onset date of September 1, 2005. The application was denied both initially and on reconsideration. Administrative Law Judge ("ALJ") Riley J. Atkins held a hearing on July 28, 2009. On September 9, 2009, the ALJ issued a decision finding IMH not disabled. When the Appeals Council denied review, the ALJ's decision became the Commissioner's final decision.

Born in 1996, IMH was 13 years old at the time of the ALJ's decision. At school, he was receiving instruction based on an Individualized Education Program ("IEP").[1]

---

[1] An IEP is a document for children with disabilities that is developed, reviewed and revised in accordance with the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1487. An IEP includes a statement of the child's present levels of academic

Opinion and Order Page 2

A. The Sequential Evaluation

A person under the age of 18 is disabled if he or she

> has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i). The Commissioner has established a three-step sequential analysis for determining childhood disability. 20 C.F.R. § 416.924(a). First, the Commissioner considers whether the claimant is engaged in substantial gainful activity. If so, the analysis ends at that point and the claimant is found not disabled. If not, the Commissioner considers whether the claimant has a physical or mental impairment that, singly or in combination with other impairments, is severe. That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the Commissioner finds the impairment or impairments not severe, the claimant is not disabled. If the impairment is severe, the analysis proceeds to the third step, in which the Commissioner determines whether the impairment meets, medically equals, or functionally equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert v. Bowen*, 482

---

achievement and functional performance, a statement of measurable annual academic and functional goals, a description of how the child's progress toward meeting the annual goals will be measured, and a statement of the special education and related services to be provided to the child. *See* 20 U.S.C. § 1414(d).

Opinion and Order Page 3

U.S. 137, 140-41 (1987). *See* 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has such an impairment and meets the duration requirement, the Commissioner finds the claimant disabled. If not, the claimant is found not disabled. 20 C.F.R. § 416.924(a).

Medical equivalence to a listed impairment means that the impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Functional equivalence to a listed impairment is determined by evaluating six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). An impairment functionally equals the listings if the claimant has "marked" limitations in at least two of the domains or an "extreme" limitation in at least one domain. *Id.* at § 416.926a(d).[2]

**B.     Medical and Educational Evidence**

IMH was diagnosed with ADHD at approximately three years of age, and was first prescribed medication for ADHD when he was in the first grade. Tr. 26, 254. Testing done on February 26, 2003, showed that IMH had a Verbal IQ of 90, a Performance IQ of 95, and a Full Scale IQ of 92. Tr. 254. Achievement tests administered on January 13, 2005, indicated that IMH's reading performance, math performance, and oral language scores were in the low average range compared to others his age. Tr. 109. His written language performance scores were in the very low range. *Id.* The examiner observed that IMH was "on task

---

[2] A "marked" limitation is defined as one that is more than moderate but less than extreme and that interferes "seriously" with the child's ability independently to initiate, sustain, or complete domain-related activities. An "extreme" limitation is one that interferes "very seriously" with the ability independently to initiate, sustain, or complete domain-related activities. *See* 20 C.F.R. §§ 416.926a(e)(2), (3) and Tr. 264.

Opinion and Order Page 4

approximately 52% of the time" and that he was "distracted easily by other students" and "talking a lot." Tr. 108.

According to an evaluation report dated January 13, 2005 and prepared by the school psychologist, Laurie Lane, IMH's classroom teacher had completed a behavior checklist called the Behavior Assessment System for Children, Second Edition ("BASC-II"), comparing IMH's behavior with that of other boys his age. Tr. 112. The teacher's scores placed IMH's behavior in the "clinically significant" range for the area of learning problems, meaning that his behavior was likely to be causing significant difficulties in that area. In the areas of attention, adaptability, and study skills, IMH's scores were in the "at risk" range, meaning that while his behavior did not currently cause significant concern, it could become a significant negative factor in IMH's adjustment to his environment if left untreated. Tr. 112. All other scores were within normal range. IMH was also administered the Conners Teacher Rating Scale-Revised, a test comparing IMH's oppositional behaviors, inattention, and hyperactivity to those of other boys IMH's age. *Id.* On this test, his behaviors were rated as average in the areas of oppositional behaviors and hyperctivity and in the "at risk" range in the area of inattention. *Id.*

After being given ADHD medication, IMH was observed by a teacher for 25 minutes on January 4, 2005: 15 minutes of independent reading time and 10 minutes of whole class instruction. *Id.* IMH was on task more than 90 percent of the time. *Id.* The teacher concluded that when IMH took his medication, he was able to maintain focus in the classroom. His math skills had improved substantially and were an area of strength, but his reading and writing skills were still significantly delayed. *Id.*

///

The January 10, 2006 IEP for IMH notes that ADHD affected his academic achievement significantly, causing him to be distracted through most of the day and to require constant redirection and one-to-one instruction. Tr. 121. He was reading and writing at a "pre primer/primer level." *Id.* Despite held back after first grade, he had "not made any progress." *Id.* He also struggled in math. *Id.*

IMH was monitored by the pediatrics department at Oregon Health Sciences University ("OHSU") between September 10, 2004 and May 10, 2006. IMH was prescribed Concerta on November 5, 2004, but this medication was not fully successful in controlling his symptoms, and Ritalin was added. Tr. 248. On June 30, 2005, IMH's diagnoses were ADHD and Bipolar Disorder, both of which were treated and controlled with medication. Tr. 247. A chart note dated February 11, 2006 indicates that IMH was having problems sleeping and was depressed, so he was started on Xanax, along with Concerta and Ritalin. Tr. 246. On February 1, 2006, Concerta was discontinued because of sleep problems, and Adderall was substituted. Tr. 245.

On December 7, 2006, when IMH was 10½ years old, he was evaluated by clinical psychologist Sage Saxton, Psy.D. Tr. 253-57. Dr. Saxton wrote that IMH was currently in the fourth grade at a public school, having repeated a grade. Tr. 253. He was receiving academic assistance in reading, written language, and mathematics. *Id.* Although IMH said he was bullied at school, Ms. Holland reported that IMH bullied others, took things, talked back to teachers, and fought with other students. *Id.* Dr. Saxton noted that IMH currently took Concerta to manage his behavior. Tr. 254.

Dr. Saxton assessed IMH's social-emotional functioning with the Childhood Depression Inventory ("CDI") and the Reynolds Childhood Manifest Anxiety Scale ("RCMAS"). *Id.* IMH's

responses to those tests suggested no clinically significant problems. *Id.*

Ms. Holland completed the BRIEF, a questionnaire that provides information about purposeful, goal-directed, problem-solving behaviors. *Id.* Dr. Saxton noted that according to Ms. Holland's responses, IMH received a Global Executive Composite score of 86, which was considered to be within the clinical range, indicating that IMH "struggles with all measured executive functions according to his mother's report." Tr. 255. Dr. Saxton concluded that IMH's presentation was consistent with the following diagnoses: ADHD, Combined Type; Oppositional Defiant Disorder; Adjustment Disorder Unspecified; and Learning Disorder Not Otherwise Specified ("NOS"). *Id.*

IMH's school records for fourth grade (2006-07) show generally "satisfactory" grades for completing work on time, listening, following directions, using class time effectively, demonstrating organizational skills, cooperating in groups, writing legibly, and respecting the rights of others, although he received notations of "needs improvement" for the second trimester of fourth grade in the areas of following school rules and accepting responsibility for behavior. Tr. 104. He was making satisfactory efforts in all academic areas. *Id.* His teacher wrote that during the first semester of fourth grade, IMH had "shown tremendous behavioral improvement," listening and behaving well and having no troubles with anger since a change in medication. Tr. 105. The teacher noted that he worked "very hard for a reward of choice time at the end of the day, and often chooses for his choice time to work ahead on weekly homework assignments with adult assistance." *Id.* He thrived on attention from staff. *Id.* The teacher commented that IMH "made fabulous academic growth during 2nd trimester," and predicted that with "increased attendance and time on task, he could make even greater progress during the 3rd

Opinion and Order Page 7

trimester." *Id.* His daily homework completion rate was 84 percent. *Id.*

Reviewing psychologist Frank Lahman, Ph.D., reviewed IMH's records and completed a Childhood Disability Evaluation Form dated January 4, 2007. Tr. 260-66. Dr. Lahman noted that according to the August 12, 2006 report of family friend Francisco Harvey, IMH was easily distracted and had an intense personality that others seemed to find intimidating. Tr. 266, 195. Dr. Lahman also cited Mr. Harvey's observation that IMH was capable of caring for his own personal needs, but lacked patience and did not do what he was told, obey rules, accept criticism and correction, or complete chores, homework, and projects. He could, however "work on crafts and projects independently." Tr. 266, 196-97. Mr. Harvey had concluded that IMH's distractibility "left him having not developed certain social and academic skills as well as others his age." Tr. 197.

Dr. Lahman summarized a questionnaire completed on September 1, 2006, by IMH's third grade teacher, Gail Campagna, in which she related that IMH's difficulties with acquiring and using information were due in part to a "high degree of absences"[3] and a need for "additional one-on-one attention." Tr. 200, 266. Dr. Saxton wrote that Ms. Campagna's report and IMH's January 2006 IEP documented IMH's significant problems with staying focused, taking turns, completing tasks, organizing materials, working without distracting himself or others, finishing work on time, interacting with others and making friends, seeking attention appropriately, expressing his anger appropriately, and handling frustration. Tr. 200-02, 204, 266.

Dr. Lahman concluded that IMH had no limitations in the domains of moving and

---

[3] School records indicate that for the second half of first grade, IMH was absent 36 days. Tr. 162. IMH was absent for 50 and tardy for 25 of 172 school days in third grade, and absent 18 out of 108 days for the first two trimesters of fourth grade. Tr. 103-04.

manipulating objects and health and well-being; "less than marked" limitations in the domains of acquiring and using information, attending and completing tasks, and caring for himself; and "marked" limitations in the domain of interacting and relating with others. Tr. 262-63. IMH responded well, however, to individualized attention and instruction. *Id.*

Dawn Hehman, IMH's fourth grade teacher, completed a questionnaire on March 23, 2007, in which she rated IMH's performance on a five-point scale: no problem, a slight problem, an obvious problem, a serious problem, and a very serious problem. Tr. 219. Ms. Hehman assigned scores in 46 different areas, concluding that IMH had "an obvious problem" with his abilities to read and comprehend math problems, express ideas in written form, focus long enough to finish assigned tasks, and wait to take turns, and a "serious problem" with reading and comprehending written material. For the remaining 41 areas, she assigned scores of "no problem" or "a slight problem." Tr. 219-23. Ms. Hehman wrote than when IMH was taking his medication, his behavior was "comparable to a typical peer," but that when his medication wore off, IMH tended to "run and jump in the classroom, argue with the teacher, and [be] unable to complete tasks." Tr. 22.

On April 10, 2007, Paul Rehthinger, Ph.D., reviewed IMH's records and prepared a report on behalf of the Commissioner. Dr. Rethinger concluded that IMH was "consistently taking medication now and is much better in terms of attending to and completing tasks as well as interacting with others." Tr. 290.

On March 24, 2008, IMH's attorney submitted a questionnaire to Kathy Burga at Terra Linda Elementary School. Tr. 239-40. The questionnaire does not identify Ms. Burga's role with respect to IMH. Ms. Burga was asked to rate IMH on a 10-point scale ranging from "ideal

Opinion and Order Page 9

functioning" to "total failure in functioning." Tr. 239. Numbers from 1-3 indicated mild problems; 4-6 indicated moderate problems; 7-9 indicated marked problems; and 10 indicated extreme problems. *Id.* In general, Ms. Burga assigned scores in the mild range, except for moderate scores in the categories of ability to learn, understand and solve problems, and complete a task in the time reasonably expected. Ms. Burga opined that IMH had marked problems with the ability to ask questions to obtain information, express feelings and ideas, and remain focused on an activity or task. Tr. 239-40. Ms. Burga noted that IMH had been "known to argue or talk back, to run/leap in the classroom, to throw paper or objects, to take things that don't belong to him, and to not relate to peers in previous school years." Tr. 240.

## C.  Hearing Testimony

Ms. Holland testified at the hearing that IMH's medication kept him awake at night, causing him to be tired during the day at school. Tr. 26-27. Ms. Holland said IMH had headaches "when he takes his medication," approximately three times a week. Tr. 27. She also reported that IMH was angry on a "daily basis," and that when angry, IMH raised his voice and sometimes threw things. Tr. 29. She said IMH had been suspended from school "a total of six times for his behavior" during the past academic year and that she had been called to the office "probably a total of 20 times" to pick IMH up early from school. Tr. 29-30. According to Ms. Holland, Concerta was not working for IMH, and he had a doctor's appointment to "switch and try something else." Tr. 33.

The ALJ asked Ms. Holland about IMH's poor attendance at counseling sessions and school. Tr. 33-34. Ms. Holland disputed notations in IMH's records that she had not been engaged in or cooperative with IMH's mental health treatment, saying that IMH "was in the

Opinion and Order Page 10

sessions and he knows what he did." Tr. 34. Asked about IMH's frequent unexcused absences and tardiness at school, Ms. Holland explained that IMH would be "having issues at home," and she would "wait till the medication kicked in" to send him to school. Tr. 34-35. She did not know why IMH's tardies and absences were noted as unexcused because "I made sure that the school knew why." Tr. 35.

IMH testified that he was "getting straight A's in the beginning of the year," but "then towards the end I started failing a couple of classes." Tr. 37. IMH said this was because he had turned in assignments late and had failed volleyball. Tr. 37. IMH said he had made many friends over the past year, both in class and outside school, and that he spent time with them skateboarding and swimming and on overnights. Tr. 38. IMH intended to play football during the next school year. Tr. 39. IMH said he "sometimes" fought with his 15-year-old brother over "video games and stuff," explaining that when his brother would not share one of his video games, "I try to take it from him and just like it becomes a fist fight sometimes." Tr. 40. IMH said his relationship with his teacher the past year had been "not so great," adding that sometimes they got along and sometimes "I'd argue with her." Tr. 41. IMH said he could see a difference in the way he felt when he took his medicine, explaining that "when I don't take my medicine, I'm all wild and everything," either unable or not choosing to control his behavior, but that when he took his medications, "I don't get headaches and I can pay attention in school." Tr. 41-42. Asked by the ALJ whether the medication gave him headaches, IMH responded that it did so only if he skipped it one day or took it too late in the day. Tr. 42.

D. The ALJ's Decision

The ALJ found that IMH has the following severe impairments: ADHD, an adjustment

Opinion and Order Page 11

disorder, oppositional defiant disorder, and a learning disorder. Tr. 12. The ALJ concluded that none of these impairments, alone or in combination, met, medically equaled, or functionally equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

The ALJ found that IMH's school records reflected that IMH improved with medication, noting that IMH's fourth grade teacher reported that he was listening and behaving well and had not had problems with anger since his medications were changed, although attendance was problematic. Tr. 13. The ALJ also cited treatment records from March 2006 reflecting that IMH was doing well on Concerta, with improved sleep, and counseling records for the period between September 2006 and December 2006 reflecting that IMH's mother had not engaged in treatment, making it difficult to implement behavioral changes or provide parenting education. *Id.* The ALJ found that the evidence supported Ms. Holland's allegations of academic difficulties, but that attendance issues had consistently been a major contributor to these difficulties. *Id.*

In the domain of acquiring and using information, the ALJ found that IMH had a less than marked limitation, based on the report of IMH's fourth grade teacher describing his work habits and academic progress as satisfactory, despite a modified curriculum in some areas and achievement scores in reading, math, and written language that were below grade level. Tr. 15. In the domain of attending and completing tasks, the ALJ found that IMH had a less than marked limitation, based on teacher reports that IMH had no serious problems in this area when he took his medication, but very serious problems when he did not. The ALJ also noted that IMH was described as thriving on attention from adults and often choosing to spend free time working ahead on homework assignments. Tr. 16.

///

In the domain of interacting and relating with others, the ALJ found that IMH had a less than marked limitation based on reports from his teacher that he had only slight problems interacting with others and that since changing medications, he no longer had problems with anger. Tr. 17.

In the domain of moving about and manipulating objects, the ALJ found that IMH had no difficulties. In the domain of caring for himself, the ALJ found a less than marked limitation, based on evidence that IMH was now taking his medication regularly, but that his mother reported he did not attend to hygiene. Tr. 19. In the domain of health and well-being, the ALJ found no limitation.

## II. STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039-40.

## III. DISCUSSION

Ms. Holland asserts that the ALJ improperly rejected the testimony of IMH, herself, and

Opinion and Order Page 13

Mr. Harvey, and she challenges the ALJ's finding that IMH's combined impairments did not meet the functional equivalency standard set out in 20 C.F.R. § 416.926a.

A.  **Rejection of Claimant and Lay Witness Testimony**

Ms. Holland asserts that although the ALJ summarized the testimony from IMH and from herself and made findings that contradicted some of Ms. Holland's testimony, the ALJ made no findings accepting or rejecting their testimony and ignored the written statement of Mr. Harvey. Although the ALJ is not required to discuss every piece of evidence, the ALJ must explain why significant probative evidence was rejected. *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984), *Costa v. Astrue,* 743 F. Supp.2d 1196, 1212 (D. Or. 2010). Social Security regulations make it clear that parents, teachers, caregivers, and others who know the claimant are "important sources of information" because of their day to day contact with the claimant and that their testimony is to be considered in determining the disability of a child. 20 C.F.R. § 416.924a(a). In every Social Security case, lay testimony is competent evidence that the ALJ must either take into account or expressly disregard with reasons applicable to each witness. *Dodrill v. Shalala,* 12 F.3d 915, 919 (9th Cir. 1993).

The Commissioner argues, unpersuasively, that because the testimony of IMH, his mother and Mr. Harvey was, "for the most part," consistent with the ALJ's findings, the ALJ did not reject it, citing *Turner v. Comm'r,* 613 F.3d 1217, 1222-23 (9th Cir. 2010) (ALJ not required to state reasons for rejecting doctor's report because doctor's conclusions were incorporated into ALJ's residual functional capacity assessment). The Commissioner's reliance on *Turner* is misplaced because the ALJ here did not incorporate the testimony of Ms. Holland or Mr. Harvey in his findings; in fact, the ALJ's findings directly contradict parts of their testimony.

Opinion and Order Page 14

It can reasonably be inferred from the ALJ's findings that the ALJ did not believe Ms. Holland's testimony that the Concerta was not working for IMH or her testimony that IMH was angry every day, shouting and sometimes throwing things, or her testimony that IMH was frequently in trouble at school. The ALJ, however, did not explicitly say that he rejected this testimony and stated no reasons for his disbelief.

The Commissioner also argues that Ms. Holland should be faulted for not explaining how her testimony was contrary to the ALJ's decision or how the ALJ failed to account for her testimony. This argument is not persuasive. The ALJ, not the claimant or the witness, is required to identify the rejected evidence and state the reasons for the rejection. *See, e.g., Stout v. Comm'r,* 454 F.3d 1050, 1053 (9th Cir. 2006); *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996) (lay testimony cannot be disregarded without comment; if ALJ wishes to discount the testimony of a lay witness, he must identify the rejected testimony and give reasons that are germane to each witness). With respect to the ALJ's failure even to comment on the testimony of Mr. Harvey, the Commissioner argues that Mr. Harvey's observations were "not significant probative evidence the ALJ needed to discuss" because Mr. Harvey's statement was completed in 2006. Since the ALJ did not state that he rejected Mr. Harvey's testimony for this reason, the court cannot affirm on that basis. *Pinto v. Massanari,* 249 F.3d 840, 847 (9th Cir. 2001) (court cannot affirm Commissioner on ground not invoked in Commissioner's decision). The ALJ's failure to explain his rejection of Ms. Holland and Mr. Harvey's testimony was error. The error is not harmless because it is not inconsequential to the ultimate non-disability determination. *Stout,* 454 F.3d at 1055. When the ALJ fails to provide any reason for rejecting evidence, the

///

reviewing court cannot determine from the record whether the ALJ's decision is adequately supported. *Id.*

## B. Functional Equivalency Findings

Ms. Holland further asserts that the ALJ erred in finding that IMH had less than marked limitations in the domains of attending and completing tasks; acquiring and using information; and caring for himself, because the ALJ failed to weigh contradictory evidence. She relies primarily on (1) her own testimony that Concerta was not working, that IMH had sleep disturbances and headaches that caused him to be absent from or tardy to school, and that IMH was still two years behind his grade level; (2) IMH's testimony that he had failed some classes at the end of sixth grade for failure to complete assignments; and (3) Mr. Harvey's testimony that IMH's "biggest problem" was that he was "easily distracted." Ms. Holland argues that this evidence warrants findings by this court of "marked limitations" in these domains and a remand for payment of disability benefits.

The court declines to provide Ms. Holland the relief she seeks. The court is not authorized to substitute its judgment for that of the ALJ when the evidence reasonably supports both the ALJ's decision and a contrary conclusion. *Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999). There is evidence in the record that supports the ALJ's decision, and the court will not substitute its views for those of the ALJ, regardless of whether the evidence might support different findings.

Remand for the payment of benefits is warranted only when the ALJ has failed to provide legally sufficient reasons for rejecting evidence that, if credited, would establish the claimant's disability. *Smolen v. Chater,* 80 F.3d 1273, 1292 (9th Cir. 1996). On the record as it now stands,

disability has not been established. The court therefore has no authority to remand for the payment of benefits. In *Strauss v. Comm'r,* 635 F.3d 1135, 1138 (9th Cir. 2011), the court held that the determination of whether to remand for the payment of benefits

> centers on what the record evidence shows about the existence or non-existence of a disability. The ALJ's errors are relevant only as they affect that analysis on the merits. A claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be.

The court therefore exercises its discretion to remand for further proceedings. *Benecke v. Barnhart,* 379 F.3d 587, 595 (9th Cir. 2004).

## IV. CONCLUSION

This case is reversed and remanded for further administrative proceedings. The Commissioner is to evaluate the testimony of IMH, Ms. Holland, and Mr. Harvey, and make functional equivalence findings in light of that testimony.

IT IS SO ORDERED.

Dated this 19th day of September, 2011.

Michael H. Simon
United States District Judge